IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENISE E. THORPE, TH.D., | ) | Civil Action No. 2:24-cv-194 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs, | ) | |
| | ) | |
| PITTSBURGH THEOLOGICAL SEMINARY, | ) | FILED ELECTRONICALLY |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, Denise E. Thorpe, Th.D. ("Dr. Thorpe"), by and through undersigned counsel, and files this Complaint in Civil Action, stating as follows:

### I. PARTIES

1. Dr. Thorpe is an adult individual currently residing in Colorado; during the time relevant to this Complaint she also resided in North Carolina.

2. Defendant Pittsburgh Theological Seminary ("PTS" or "the Seminary") is an institution of post-secondary education with its primary place of business at 616 N. Highland Avenue, Pittsburgh, PA 15206.

### II. JURISDICTION

3. The jurisdiction of this Court over the matters set forth in this Complaint is found at 28 U.S.C. § 1331 and at 28 U.S.C. § 1367.

### III. VENUE

4. The facts set forth in this Complaint occurred in Allegheny County, Pennsylvania, in the Western District of Pennsylvania; therefore, venue is appropriate in this Court.

## IV.  FACTS

5.  Dr. Thorpe was hired by PTS in 2018, and she served as interim director of the Doctor of Ministry program ("D.Min. program").

6.  Dr. Thorpe is a graduate of Yale Divinity School, and she holds a law degree and a Doctor of Theology degree from Duke University.

7.  In addition to being an ordained Presbyterian minister, Dr. Thorpe is an attorney licensed in Colorado.

8.  At PTS, the Director of the D.Min. program is responsible for student support, course organization/support, communications about the program, recruiting, and admissions.

9.  For the majority of the time Dr. Thorpe worked at PTS the sole staff assigned to the D.Min. program was the director and a full time program coordinator.

10.  At Dr. Thorpe's request a part-time contract position was established in 2019 to provide support for students who were struggling and in June 2021 a half-time employee position was added.

11.  Even though a significant portion of the PTS student body was composed of D.Min. program students, the program itself was supposed to function with limited support from student services, admissions and recruiting, and most other administrators.

12.  Moreover, a significant portion of both the students enrolled in the D.Min program, as well as the faculty teaching in the D.Min program, are white.

13.  Although most of the PTS program directors hold doctorates, since the time Dr. Thorpe worked there all non-faculty women at PTS who hold either Ph.D. or Th.D. degrees (all of whom are over 50 years of age) have been terminated or left for lower-paying jobs.

14. Between December 2018 and February 2020 and between August 2021 and December 2021 Dr Thorpe worked remotely, regularly visiting the Pittsburgh campus.

15. From March 2020 to August 2021 Dr. Thorpe worked remotely due to COVID and campus closure.

16. During her initial discussions with other faculty and staff at PTS, Dr. Thorpe learned that the Seminary had difficulty retaining African American faculty.

17. When Dr. Thorpe was first hired one of her colleagues within the D.Min. program ("Dr. Thorpe's D.Min. colleague" or "Dr. Thorpe's D.Min. program colleague") served as administrative support for both the Vice President and Dean of Academic Affairs and the D. Min program.

18. At PTS, all employees were required to undergo diversity, equity, and inclusion training ("DEI training").

19. Per this DEI training, PTS employees were encouraged to speak out when a fellow faculty or staff member was being mistreated-particularly based on race, gender, or ethnicity.

20. Dr. Thorpe's D.Min. colleague is an African American woman.

21. Dr. Thorpe's D.Min. colleague was severely overworked and undersupported.

22. Dr. Thorpe's D.Min. colleague had shared with Dr. Thorpe (who was her nominal superior) that she had been the target of racially discriminatory actions and bullying on the part of the PTS staff, in particular members of the PTS student services staff.

23. Dr. Thorpe became aware of the targeting of her D.Min. colleague when she started work at PTS.

24. For example, on Dr. Thorpe's first day at PTS, the Registrar, Anne Malone ("Ms.

3

Malone"), asked Dr. Thorpe to come into her office where she complained that Dr. Thorpe's D.Min. colleague was keeping information from her and not doing her work adequately.

25. Dr. Thorpe's D.Min. colleague complained to her that she had been the target of racial discrimination and bullying.

26. Dr. Thorpe's D.Min. colleague expressed to Dr. Thorpe her need for additional material support as well as her desire for programming at the Seminary that would address issues related to institutional racism.

27. Dr. Thorpe's D.Min. colleague had been the target of unnecessary criticism for her difficulty in using the Seminary's data input program, Jenzabar.

28. Ms. Malone complained to Dr. Thorpe that Dr. Thorpe's D.Min. colleague was not properly loading information into Jenzabar.

29. Dr. Thorpe would later learn her D.Min. colleague had been providing material support for multiple programs at PTS and that in the years preceding Dr. Thorpe's time at PTS, her D.Min. colleague had not taken extended periods of time off for vacation.

30. Shortly after assuming the duties of interim director of the D.Min. program, Dr. Thorpe urged that the Seminary hire additional support staff for the program and that it expand its initiatives to support minority/non-white D.Min. students who may have been struggling academically.

31. Dr. Thorpe further requested that her D.Min. program colleague–who had been classified as an administrative assistant to both the Academic Dean and the D. Min. program director–be reclassified as a program coordinator.

32. Dr. Thorpe also learned that some members of the student services staff had also been

engaged in discriminatory actions towards African American students.

33. Dr. Thorpe had raised concerns regarding the racially discriminatory treatment of her D.Min. program colleague with other members of the Seminary administration.

34. In addition to racially based discrimination, PTS has been a center of gender based discrimination: since 2016, 38 women have left employment at PTS, while only 11 men have left PTS.

35. In 2019, then Seminary President David Esterline ("Dr. Esterline") recommended that all incoming students be subjected to a background check.

36. Dr. Thorpe objected to the proposal on the grounds that the imposition of background checks was contrary to the Seminary's Christian values.

37. Other members of the PTS faculty and members of the PTS staff–including Dr. Thorpe's D.Min. colleague–raised concerns that the use of background checks was contrary to the spiritual values of the Seminary.

38. Dr. Thorpe's D.Min. colleague also raised concerns that the use of background checks would have a negative impact on applicants from minority backgrounds due to pervasive discriminatory policing practices in the United States.

39. Dr. Thorpe would later object to Dr. Esterline's proposal on the grounds that doing so would discourage members of minority groups from applying to the Seminary.

40. Dr. Thorpe provided Dr. Esterline with research indicating that background checks would discourage minority applicants from applying to PTS.

41. Dr. Thorpe also surveyed other theological schools committed to anti-racism to determine their practice in relation to background checks.

42. Ultimately, D.Min. applicants were required to submit to background checks, Dr. Thorpe's objections to the contrary notwithstanding.

43. Dr. Thorpe and her D.Min. colleague met with administration regarding their concerns and were told that any requirement of background checks would include language acknowledging the differential impact of policing on minority communities along with reassurance that this impact would be taken into account when evaluating material discovered through background checks.

44. Without further consultation with Dr. Thorpe and her D.Min. colleague, a background check requirement was added to the on-line D.Min. application without including the language agreed upon about the disparate impact of policing.

45. Ultimately, the issue of background checks was resolved by including language in the PTS application materials indicating that a criminal conviction would not preclude admission into the PTS program.

46. Dr. Thorpe also objected to the racially discriminatory treatment of her D.Min. colleague.

47. Specifically, in January 2020, Dr. Thorpe complained to Dr. Esterline about the discriminatory treatment and bullying of her D.Min. colleague by other employees at PTS.

48. In February 2020, due to the COVID-19 pandemic, the seminary transitioned to remote work.

49. In July 2020, the Seminary engaged in a major restructuring program; the majority of employees impacted by this restructuring were older and/or female staff members.

50. The position of Dean of Students–which at the time was held by John Welch, who

was the most senior African American administrator at PTS at the time–was eliminated.

51. During the Fall 2020 semester, Dr. Thorpe raised concerns regarding the fact that non-white, minority staff may have been affected negatively due to the restructuring.

52. Dr. Esterline retired as President of PTS in Fall 2020, and Asa Lee ("Dr. Lee") was appointed to be the next President of PTS.

53. Dr. Lee would assume office in June 2021.

54. Around this time, several new cohorts of students were admitted to the D.Min. program, and Dr. Thorpe requested additional funding for the program.

55. Dr. Thorpe applied to serve as permanent director of the D.Min. program.

56. The job description for the position then held by Dr. Thorpe expressly indicated that she could apply for the permanent director position.

57. Other faculty members at PTS expressed their support for Dr. Thorpe's application to serve as the permanent director of the D.Min. program.

58. The new permanent director of the D.Min. program ultimately would become the supervisor for Dr. Thorpe's D.Min. colleague.

59. In the early part of 2021 a search committee for a permanent director for the D.Min. program was convened.

60. As interim director, Dr. Thorpe had advocated for greater diversity within the D.Min. program.

61. During this time period Dr. Thorpe remained interim director of the D.Min. program; in that capacity she continued to push for greater program funding.

62. In the spring of 2021, Dr. Thorpe was asked to submit a report to the PTS Board of

Directors.

63. In her report, Dr. Thorpe included a graph that she and her D.Min. colleague had prepared illustrating the huge disparity in budgeted scholarship and financial aid funding for the D.Min. program in comparison with the other degree programs at the Seminary (in 2018-2019, approximately $23,000 for the D.Min. program and $950,000 for the Master's level degree programs).

64. The PTS administration removed that graph and information from Dr. Thorpe's report before submitting the report to the Board of Directors.

65. In June 2021, Dr. Thorpe applied to serve as permanent director of the D.Min. program; at the time of her application she had been running the program for over two years.

66. Dr. Thorpe had met, spoken, or corresponded with PTS administrators–including Dr. Lee–regarding the status of the D.Min. program.

67. By this time Dr. Thorpe was working on a month-to-month contract.

68. During October 2021, Dr. Thorpe met with members of the search committee for the D.Min. director position.

69. During this time Dr. Thorpe requested that Leanna Fuller ("Dean Fuller"), who was serving as Dean of the Faculty at PTS, provide her with a timeline for filling the D.Min. directorship.

70. Dr. Thorpe also told Dean Fuller that she had been working on a monthly contract.

71. Dean Fuller expressed surprise at the fact that Dr. Thorpe had been working on a monthly contract, and later would tell Dr. Thorpe that Dr. Lee had agreed to extend her contract out to March 2022.

72. Dr. Thorpe also had expressed to Dean Fuller concern over the negative treatment of

Dr. Thorpe's D.Min. program colleague.

73. At the time of her conversation with Dean Fuller, Dr. Thorpe had a number of plans already in motion for the D.Min. program.

74. In light of her then-ongoing service to the Seminary, Dr. Thorpe should have been informed of the status of the search for a permanent director so as to better plan for the future of the program.

75. Dr. Thorpe was never provided with an adequate timeline regarding the search for a permanent director of the D.Min. program.

76. Dr. Esterline and Dr. Lee had expressed an intent to complete the hiring of the permanent Director of the program by early Fall 2021.

77. In the fall of 2021, Dr. Thorpe's D.Min. colleague also shared with Dr. Lee her experiences of discrimination and the support and advocacy Dr. Thorpe had provided in addressing that experience.

78. During a reception held in early October 2021, an African-American student in the D.Min. program expressed her positive views of Dr. Thorpe's management of the program to Dr. Lee.

79. In October 2021 Dr. Thorpe was serving as chair of a search committee to fill a vacant professorship in Old Testament studies.

80. Even through she was serving as the chair, Dr. Thorpe was not invited to attend a dinner with a leading candidate for the position when that candidate visited the PTS campus.

81. Although Dr. Thorpe was chair of the search committee, she was not consulted when the date for the leading candidate's visit to campus was set.

82. At PTS, chairs of search committees are normally invited to dinner with job candidates.

83. The fact that Dr. Thorpe was not invited to dinner constitutes a diversion from prior practice.

84. Dr. Lee later announced the name of the successful candidate for the Old Testament position at a faculty meeting.

85. During the aforementioned meeting, Dr. Lee appeared uncertain as to Dr. Thorpe's role within the search committee and proceeded to thank and recognize a male member of the search committee who had only recently joined the committee; that male member of the search committee had been invited to the dinner with the candidate to which Dr. Thorpe was not invited.

86. In November 2021, Dr. Thorpe learned that she was a finalist to serve as permanent director of the D.Min. program and was offered a chance to interview with the search committee.

87. Dr. Thorpe later would learn that the other two finalists for the program were male.

88. In Fall 2021 Dr. Thorpe also became the faculty representative to the Seminary Finance Committee.

89. During her participation on the Finance Committee, Dr. Thorpe learned that the tuition reduction scholarships for the D.Min. program were not being reported as unfunded scholarships in accordance with the generally accepted accounting principals ("GAAP").

90. When the chair asked for questions, Dr. Thorpe attempted to raise her concern that the seminary was not following GAAP reporting of the D.Min. program tuition reduction scholarships even though GAAP reporting was used in the rest of the budget and that the minutes from the meeting where the decision was made (a meeting where no faculty representative was

present) did not note that this variance was not typical of budgeting practices at the Seminary.

91. When Dr. Thorpe attempted to voice those concerns, Dr. Lee–who was not the chair of the aforementioned meeting–cut her off and silenced her.

92. During this meeting Dr. Thorpe emailed Dr. Lee to explain the importance of her questions and to offer to meet with him to discuss her concerns in greater depth.

93. Dr. Lee responded to Dr. Thorpe's email by indicating that he thought that she was "discourteous" by raising her concerns in public without discussing them with him in advance.

94. In a subsequent meeting with Dean Fuller and Dr. Lee, Dr. Lee acknowledged that silencing was an accurate term, that he had indeed silenced Dr. Thorpe, and that he felt it was appropriate for him to do so.

95. At no point was Dr. Thorpe ever told that she was to vet the questions that she intended to ask at a public meeting in advance with the PTS president.

96. Most of the members of the Finance Committee were male, but none of them were publically cut off by Dr. Lee.

97. The Chair of the PTS Board of Directors, James Gockley–who was in attendance at the aforementioned meeting–indicated that if Dr. Lee had not silenced Dr. Thorpe he would have.

98. None of the members of the Finance Committee objected during the meeting to Dr. Lee's treatment of Dr. Thorpe.

99. On December 2, 2021, Dr. Thorpe interviewed with the members of the search committee and her presentation to the committee received the highest rating from faculty, students, and the majority of the staff.

100. The day after her interview with the search committee Dr. Thorpe met with Dean

Fuller and Dr. Lee and indicated that she felt that she had been bullied by Dr. Lee.

101. Dr. Thorpe also told Dr. Lee that one of her former female colleagues had indicated that there was a need to build "trust" within PTS and had raised the history of institutional racism and sexism at the Seminary at a meeting that both Dr. Lee and Dr. Thorpe had attended.

102. Dr. Thorpe later would learn that a few non-faculty staff members–about whom she had raised concerns regarding the treatment of the Dr. Thorpe's D.Min. colleague–had given her a negative rating.

103. These survey respondents had used the survey tool not as was intended-to evaluate each candidate's presentation-but as an instrument of retaliation against Dr. Thorpe for her support and advocacy.

104. Dr. Thorpe also would learn that the members of the search committee engaged in a derogatory conversation regarding her weight and appearance.

105. Most of the search committee's questioning did not focus on Dr. Thorpe's accomplishments as interim program director but rather focused on gendered topics such as caretaking by repairing "scar tissue."

106. Prior to the meeting with the full search committee, Dr. Lee had a meeting with Dr. Thorpe during which he accused her of creating "scar tissue" at PTS and described her derisively as a "privileged white woman."

107. During the meeting with the full search committee Dr Lee also indicated that the committee was going to spend the time "drilling down" on this "scar tissue" concern.

108. Dr. Lee did not clarify what he meant by "scar tissue," but Dr. Thorpe understood it to mean any sentiment stemming from her advocacy on behalf of Dr. Thorpe's D.Min. colleague and

of minority students.

109. Dr. Thorpe indicated to Dr Lee that she understood him to be talking about reactions to her stemming from her raising concerns about the treatment of her D.Min. colleague and he acknowledged that to be accurate.

110. Dr. Lee cautioned Dr. Thorpe to be less "direct" in raising her concerns regarding the Seminary.

111. Dr. Lee continued bullying Dr. Thorpe, and she started to feel that her candidacy for the permanent director position was futile.

112. As Dr. Lee indicated at the beginning of the meeting with the search committee, the majority of the interview did not focus on Dr. Thorpe's performance, goals, or plans, but on how Dr. Thorpe would remediate ill feelings some members of student services had toward her as a result of her advocacy.

113. Shortly thereafter, on or around December 16, 2021, Dr. Lee and Dr. Thorpe had a Zoom call during which Dr. Lee informed Dr. Thorpe that she would not be hired as permanent director and that the search would be deemed to be a "failed" search.

114. On December 21, several days after Dr. Thorpe's conversation with Dr. Lee and in the final hours before the Seminary closed for the holidays, Dr. Lee sent out a mass e-mail to the PTS community indicating that the search had been closed without selecting a permanent D.Min. Director.

115. The aforementioned email did not include Dr. Thorpe's name or acknowledge her service to the school.

116. After Dr. Lee sent the aforementioned email, confused students approached Dr.

Thorpe and asked whether she intended to remain at the seminary.

117.    Pursuant to her contractual obligations, following their December 16 conversation Dr. Thorpe had informed Dr. Lee that her last day of work at the Seminary would be January 15.

118.    When the Seminary reopened at the beginning of January a notice was sent to the Seminary and larger community indicating that Dr. Thorpe was no longer employed at the Seminary although she was still employed there and was not ending her employment until January 15.

119.    Dr. Thorpe's last day as an employee at PTS was January 15, 2022.

120.    Dr. Lee met with each of the D.Min. student cohorts after the end of Dr. Thorpe's employment.

121.    During those meetings, Dr. Lee told the students that Dr Thorpe had been given the opportunity to stay longer to ease their transition and that she had chosen not to.

122.    In doing this he failed to explain the larger circumstances and did not reveal the fact that as the search was proceeding Dr. Thorpe requested a reliable timeline in order to allow her to plan for a smooth transition if needed, and PTS declined to provide that timeline; this further damaged Dr. Thorpe's reputation.

123.    The adverse treatment Dr. Thorpe experienced at PTS affected her psychologically and emotionally and damaged her reputation.

124.    Under Dr. Thorpe's leadership the D.Min. program was the only degree program at the Seminary with a positive tuition yield.

125.    The program enrollment also nearly doubled in size under Dr. Thorpe's leadership.

126.    After full recruitment of the D.Min. program cohorts initiated during Dr. Thorpe's time at PTS, D.Min. students constituted more than 61% of the student body.

14

127. Dr. Thorpe also oversaw the establishment of two new focus areas within the D.Min. program designed to increase diversity: an Intergenerational Black Church Studies cohort and a cohort structured on the parish focus model but intentionally focusing on race, adaptability, and sustainability during times of change.

128. Dr. Thorpe also oversaw the inauguration of a new program in public theology and creative writing.

129. Her positive performance notwithstanding, Dr. Thorpe was not hired on a permanent basis on account of her gender.

130. Dr. Thorpe was also not hired on a permanent basis because of her advocacy on behalf of staff and students from minority backgrounds as well as because of her criticism of the PTS administration.

131. Dr. Thorpe demands a jury trial.

## V.  COUNTS

### COUNT I: DISCRIMINATION ON THE BASIS OF SEX
### Violation of Title IX

132. The preceding paragraphs are incorporated as if set forth at length herein.

133. Title IX prohibits educational institutions that receive financing from the federal government from engaging in discrimination on the basis of sex.

134. The Seminary is an educational institution that receives financing from the federal government.

135. Dr. Thorpe is a woman and, as such, is a member of a class protected by Title IX.

136. Dr. Thorpe was qualified for her position at the Seminary.

137. Dr. Thorpe was subjected to an adverse employment action when she was not hired for the position of permanent director of the D.Min. program.

138. Dr. Thorpe's male colleagues were not subjected to similar adverse employment action.

139. Dr. Thorpe was treated less favorably on account of her sex.

140. PTS administrators were aware of the discriminatory actions against Dr. Thorpe.

141. Dr. Thorpe seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT II: RETALIATION
### Violation of Title IX

142. The preceding paragraphs are incorporated as if set forth at length herein.

143. Title IX prohibits educational institutions that receive financing from the federal government from engaging in discrimination on the basis of sex.

144. The Seminary is an educational institution that receives financing from the federal government.

145. Dr. Thorpe is a woman and, as such, is a member of a class protected by Title IX.

146. Dr. Thorpe was qualified for her position at the Seminary.

147. Dr. Thorpe complained of the sexually discriminatory atmosphere at PTS.

148. Specifically, Dr. Thorpe complained to PTS administrators regarding the treatment of her D.Min. colleague.

149. Dr. Thorpe was subjected to an adverse employment action when she was not hired

for the position of permanent director of the D.Min. program.

150. Similarly situated employees were not subjected to similar adverse employment actions.

151. The aforementioned adverse employment action was in retaliation for Dr. Thorpe's engagement in protected activity.

152. Administrators at PTS were aware of the discriminatory actions taken against Dr. Thorpe.

153. Dr. Thorpe seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

### COUNT III: HOSTILE WORK ENVIRONMENT
### Violation of Title IX

154. The preceding paragraphs are incorporated as if set forth at length herein.

155. Title IX prohibits educational institutions that receive financing from the federal government from engaging in discrimination on the basis of sex.

156. The Seminary is an educational institution that receives financing from the federal government.

157. Dr. Thorpe is a woman and, as such, is a member of a class protected by Title IX.

158. Dr. Thorpe was qualified for her position at the Seminary.

159. Dr. Thorpe was subjected to a hostile work environment.

160. Dr. Thorpe's male colleagues were not subjected to a similar hostile work environment.

161. Dr. Thorpe was treated less favorably on account of her sex.

162. Administrators at PTS were aware of the discriminatory actions taken against Dr. Thorpe.

163. Dr. Thorpe seeks all remedies and damages permitted under Title IX, including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT IV: RETALIATION
### Violation of 42 U.S.C. § 1981

164. The preceding paragraphs are incorporated as if set forth at length herein.

165. 42 U.S.C. § 1981 prohibits the impairment of contracts on account of race.

166. Dr. Thorpe was qualified for her position at PTS.

167. Dr. Thorpe engaged in actions protected by 42 U.S.C. § 1981 when she complained of the racial discrimination and bullying of African American students and staff at PTS.

168. Specifically, Dr. Thorpe complained to PTS administrators regarding the treatment of her D.Min. colleague.

169. Dr. Thorpe was subjected to an adverse employment action when she was not hired for the position of permanent director of the D.Min. program.

170. Similarly situated employees were not subjected to similar adverse employment actions.

171. The aforementioned adverse employment action was in retaliation for Dr. Thorpe's engagement in protected activity.

172. Dr. Thorpe seeks all remedies and damages permitted under 42 U.S.C. § 1981,

including, but not limited to, back pay, front pay, emotional distress, medical harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and post-judgment interest.

## COUNT V: BREACH OF CONTRACT
### Violation of Pennsylvania Common Law

173. The preceding paragraphs are incorporated as if set forth at length herein.

174. In order to state a claim for breach of contract under Pennsylvania law, a plaintiff must first plead the existence of a contract (including its essential terms), a breach of the contract on the part of the defendant, and resultant damages.

175. Under Pennsylvania law, employer policies and employee handbooks may give rise to a contract between the employee and the employer.

176. The Seminary has published a Faculty Handbook (appended hereto has "Exhibit A"), that sets forth a set of by-laws for the faculty.

177. The Faculty Handbook sets forth a guarantee of basic academic freedom to all faculty at PTS. *See* Faculty Handbook at 10 ("...a faculty member is free to express opinions in research, publishing, teaching and public actions, without prior authorization of PTS. In this freedom, faculty may expect the support of their institution").

178. The Faculty Handbook also states that "[r]ecommendations for appointment and promotion shall be based upon the individual merits of the candidate as well as: (1) the current standards of the relevant discipline or profession at large and (2) the current and expected future requirements of the candidate's division." Faculty Handbook at 12.

179. Dr. Thorpe had demonstrated that she was qualified to serve as permanent director of the D.Min. program.

180. The fact that Dr. Thorpe was not hired for the permanent director position on account of her criticism of the PTS administration constitutes a violation of both the academic freedom and the merit-based hiring policies set forth above.

181. Dr. Thorpe suffered both economic and psychological harm as a result of the Seminary's violation of policies.

182. Dr. Thorpe seeks all remedies available under Pennsylvania law for breach of contract.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.

s/James B. Lieber
James B. Lieber, Esq.
Pa. I.D. No. 21748
Thomas M. Huber, Esq.
Pa. I.D. No. 83053
Jacob M. Simon, Esq.
Pa. I.D. 202610
1722 Murray Ave., 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (tel.)
(412) 687-3140 (fax)